# United States Court of Appeals

## For the First Circuit

No. 06-1318

UNITED STATES OF AMERICA,

Appellee,

v.

JHON JAIRO ARANGO,

Defendant, Appellant.

———————————

No. 06-1319

UNITED STATES OF AMERICA,

Appellee,

v.

DARÍO OSORIO-NORENA

Defendant, Appellant.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Court]

———————————

Before

Torruella and Lipez, Circuit Judges,
and Stafford, Jr.,[*] Senior District Judge.

———————————

Mark Diamond for appellant Osorio-Norena.
David Abraham Silverman for appellant Arango.

———————————

[*]Of the District of Northern Florida, sitting by designation.

Patrick Hamilton, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

November 15, 2007

**LIPEZ**, **Circuit Judge**. Although co-defendants Jhon Jairo Arango ("Arango") and Dario Osorio-Norena ("Osorio") pled guilty to money laundering and drug distribution charges, they contested the amount of money and the quantity of drugs involved in the crimes. After a fourteen-day evidentiary hearing, the district court found them responsible for laundering $1.8 million in drug proceeds and for participation in a conspiracy involving sixty-seven kilograms of cocaine. Each received a sentence of 262 months of imprisonment and a $2 million fine. For Arango, the sentence was at the bottom of the applicable range under the United States Sentencing Guidelines. For Osorio, that sentence corresponded to a downward departure of thirty months because he had a prior conviction placing him in a higher Criminal History Category ("CHC") than Arango.

Both defendants appeal their sentences on multiple grounds. Their primary argument is that the district court erred in failing to state the reasons for their sentences in open court, as required by 18 U.S.C. § 3553(c). Although the sentencing explanations are not as fully stated as they might have been, we conclude that in the circumstances of this case there was no error.

Both defendants also contend that the court erred in granting them only a two-level, rather than a three-level, adjustment for acceptance of responsibility, and Osorio alone raises a number of other claims. In his primary brief, he asserts

-3-

that the court: (1) improperly based his sentence on facts not found by the jury beyond a reasonable doubt and, even under the preponderance-of-the-evidence standard, incorrectly calculated the quantity of drugs and the amount of laundered money for which he may be held responsible; (2) failed to consider the sentencing factors set out in 18 U.S.C. § 3553(a); and (3) failed to properly determine whether a fine should be assessed against him.  In a pro se brief, Osorio elaborates on some of those claims and adds two more: that the government breached a plea agreement and that the court improperly found that he played a leadership role in the drug conspiracy.  We reject all of Osorio's individual claims, along with the joint claim that the district court erred in granting only a two-level reduction in offense level for defendants' acceptance of responsibility.  We therefore affirm the sentences.

## I.

In August 2004, a federal grand jury returned a fourth superseding indictment against defendants Arango and Osorio, charging each of them with three counts: conspiracy to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count One); conspiracy to launder drug proceeds, in violation of 18 U.S.C. § 1956(h) (Count Two); and distribution of five or more kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count Three).  A jury trial was scheduled to begin on March 21, 2005.  On

March 16, Arango notified the government that he intended to plead guilty. Osorio did the same on the morning of March 21.

At a change of plea hearing, Arango pled guilty to all three charges in the indictment, and Osorio pled guilty on the first two counts but entered an Alford plea as to the third count. See North Carolina v. Alford, 400 U.S. 25, 37 (1970) ("An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime."). Both defendants admitted that the conspiracy involved five kilograms of cocaine, but contested any quantity above that amount. They did not concede any dollar amount on the money-laundering count. Arango admitted responsibility for the seven kilograms of cocaine charged in the distribution count; Osorio, through the Alford plea, denied responsibility for that specific distribution of cocaine.

The district court held a fourteen-day evidentiary hearing to establish the quantities of drugs and amount of money involved in the crimes. Law enforcement officers testified that the defendants were arrested and extradited to Massachusetts from Colombia as part of an investigation that also led to the indictment of fourteen other individuals. Among them were two cooperating witnesses who testified at the hearing, Liliana Cruz and Jorge de Jesus Vallejo Alarcon ("Vallejo"). Cruz's direct

testimony occupied eight days of the hearings and her cross-examination spanned an additional two. She testified in detail about her role in transporting drugs from New York to Massachusetts on behalf of Arango and Osorio between 1998 and mid-August 1999 and her later involvement in laundering money for the defendants from early 2000 until her arrest in June of that year.

Of particular relevance, she testified that she transported cocaine from New York to Boston at Osorio's request on five separate occasions. According to her testimony, she picked up the drugs in Queens and in the Bronx. On each trip to Queens, she called Osorio upon arriving at a designated location. Shortly thereafter, the person who was delivering the drugs called her cell phone. She would then meet with that person, inspect the drug quantity, take delivery of the drugs, and transport the narcotics to Massachusetts. Cruz would then phone Osorio and tell him where he could pick up the car, and she would leave the drugs in the unlocked vehicle. The car would be returned to her in the morning, without the drugs. The Bronx trips occurred in roughly the same manner except that Cruz received the drugs by leaving her unlocked car in a pre-arranged location and returning later, after the drugs had been delivered. She also testified that Osorio named Arango as the source of the drugs she picked up in Queens on her first trip there, and she supposed that the second shipment from Queens also came from him because she met with the same people in Queens on

that trip. She did not know whether the deliveries from the Bronx were related to Arango.

Cruz also testified to specific drug quantities. She reported that she delivered fifty kilograms of cocaine in her first trip from Queens to Massachusetts and ten kilograms on her second trip. She also recounted that she delivered fifty and twenty-five kilograms, respectively, on her two trips from the Bronx. Cruz testified that she made a fifth trip between New York and Massachusetts at Osorio's request involving an additional fifty kilograms of cocaine; however, she recalled that Arango was in Colombia at the time of that trip and she could not be sure who supplied the drugs.

Cruz testified that she began laundering proceeds from the drug transactions in 2000. She reported that, at defendants' request, she transported money from New York to Massachusetts on three separate occasions, in the amounts of $500,000, $600,000, and $500,000, respectively. She also testified that she received deliveries of smaller amounts of money from two brothers with the surname "Cataño" and from Alonso Tavarez, and that Arango or Osorio called to inform her of each such delivery before it occurred. The defendants also instructed her as to the distribution and mailing of those monies, which together totaled $699,000. Osorio also instructed her on how to hide money in electronic toys so that she could ship it to Colombia undetected. In addition to sending money

-7-

in this manner, she also occasionally wired small amounts of money to defendants and, at their direction, delivered money to other members of the conspiracy in the United States. Cruz testified that she kept careful records of the amounts of money collected and delivered to various parties and she retained her shipping receipts until either Arango or Osorio confirmed receiving the money.

Finally, Cruz testified that she bought seven kilograms of cocaine from Alonso Tavarez shortly before her arrest and that Tavarez told her the cocaine came from Arango and Osorio. Cruz intended to use this cocaine as part of a ten-kilogram sale to Camilo Aguirre. Unbeknownst to Cruz, Aguirre was the target of a United States Drug Enforcement Administration investigation and, after she delivered the first five kilograms of cocaine to Aguirre, she was arrested. A subsequent investigation of her house produced the remaining five kilograms, along with extensive records related to her drug and money laundering activities. Shortly after her arrest, Cruz became a cooperating witness and allowed the government to record her phone calls.

Cruz's testimony was corroborated by various forms of evidence, including receipts and other records found at her house, tape-recorded phone calls, and the testimony of law enforcement officials and Vallejo, who reported that he was sent by Arango and Osorio to aid Cruz in collecting money owed by a distributor. In one taped conversation between Cruz and Arango, Arango reviewed the

amounts of money that had been delivered to her from the Cataños and Tavarez and how that money had been distributed. Those amounts matched Cruz's written records. In addition, Cruz had receipts for two Avianca shipments, mailed to Arango and his wife, in which she had concealed $160,000 from her first money laundering trip to New York but which had been intercepted by U.S. Customs officials. Customs documents confirmed that two packages matching these shipping receipts were intercepted at the relevant time.

At the close of the evidentiary hearing, the district court made a number of factual findings. Deeming Cruz a credible witness, it found the defendants responsible for "at least" sixty-seven kilograms of cocaine on the drug charges and for $1.8 million on the money laundering charge. It arrived at the sixty-seven kilogram figure by adding together fifty kilograms from one trip and ten kilograms from a second trip Cruz made to Queens on behalf of defendants, along with the seven kilograms she purchased from Tavarez, who received the cocaine from Arango and Osorio. The court arrived at the money laundering figure by adding together $500,000 and $600,000 that Cruz testified she retrieved from New York at defendants' request in the spring of 2000, plus the roughly $700,000 that was delivered to her in small amounts by the Cataño brothers and Tavarez.[1]

---

[1] Cruz actually testified that she made three trips to retrieve money from New York: two for $500,000 and one for $600,000. The government noted the discrepancy in the $1.8 million

-9-

The district court also found that the facts supported a sentencing enhancement under U.S.S.G. § 3B1.1(a) because defendants were leaders or organizers in a criminal activity that involved five or more participants or was otherwise extensive. Although the court applied the preponderance of the evidence standard in making these findings, it stated that it "would have no difficulty in making . . . all of the findings beyond a reasonable doubt."

The Presentence Report ("PSR") prepared by the Probation Office calculated a base offense level of 41 for Arango and Osorio.[2] The court granted both defendants a two-level downward adjustment in their offense levels for acceptance of responsibility, but found they did not qualify for the additional one-level reduction that is given for timely notification of the intent to plead guilty. See U.S.S.G. § 3E1.1(b)(2). Arango had no prior criminal history and therefore was assigned a criminal history score of "I"; Osorio's criminal history score was "II," based on his failure to pay a fine and complete the probationary period related to a drunk driving incident in 1994. Under the Guidelines, Arango was subject to a sentencing range of 262 to 327 months, and Osorio's range was 292 to 365 months.

figure, which was a result of its own calculation error, but the court declined to correct its finding, explaining that the Guidelines sentencing range would remain the same.

[2] Arango and Osorio were sentenced under the November 2000 version of the Guidelines and all references in this opinion correspond to that edition.

The court sentenced Arango to 262 months of imprisonment on the drug counts and 240 months on the money laundering count, to run concurrently and to be followed by five years of supervised release. It also imposed a fine of $2 million and a special assessment of $300. The court imposed the same sentence on Osorio, explaining that it viewed both men to be equally culpable and that Osorio's criminal history, though not insignificant, did not warrant a sentencing disparity between the two men. The court noted that it viewed the 262-month term as "sufficient to meet the sentencing factors outlined in the statute" – a reference to 18 U.S.C. § 3553(a), which sets out various factors courts should consider in sentencing.[3]

Arango and Osorio appeal these sentences on multiple grounds. They claim that the district court failed to adequately explain the basis for the sentences it imposed, as required by 18 U.S.C. § 3553(c), and also erred in denying them a three-level downward adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(b)(2). Osorio raises several additional challenges: (1) that the court improperly failed to consider the

---

[3] Those factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; to afford adequate deterrence; to protect the public; to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and the kinds of sentences available.

factors laid out in 18 U.S.C. § 3553(a); (2) that the calculations of drug quantity and laundered money were flawed either because the court's findings were not supported by a preponderance of the evidence or because they should have been found by a jury beyond a reasonable doubt; and (3) that the court abused its discretion in imposing a $2 million fine on Osorio without considering his ability to pay. In his pro se supplemental brief, Osorio also argues that the government breached a plea agreement and that the court improperly enhanced his sentence based on his leadership role in the charged conspiracies.

## II.

### A. Acceptance of Responsibility

Arango and Osorio contend that the district court erred in granting them a two-level, rather than three-level, reduction in offense level for acceptance of responsibility. The Guidelines provide for a two-level downward adjustment "if the defendant clearly demonstrates acceptance of responsibility for his offense," § 3E1.1(a), and an additional one-level reduction is available if the defendant "has assisted authorities in the investigation or prosecution of his own misconduct by . . . timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and

permitting the court to allocate its resources efficiently."
§ 3E1.1(b)(2).[4]

The defendants argue that, by pleading guilty on all counts of the indictment, they allowed the government to avoid the time and expense of preparing for and conducting a trial and that they therefore met the criteria for the additional reduction. The government counters that, although both defendants pled guilty to the charged crimes, their pleas were "untimely" and did not save the government significant time or expense, as it had already engaged in substantial trial preparation by the time they agreed to enter their pleas.

The parties thus dispute the district court's determination that defendants' pleas were "untimely" under § 3E1.1(b)(2). We review this determination for clear error, United States v. Ortiz-Torres, 449 F.3d 61, 76 (1st Cir. 2006), noting that the Guidelines commentary specifies that such determinations are "context specific," and that "conduct qualifying for [the third level of decrease] will occur particularly early in the case . . . so that the government may avoid preparing for trial and the court may schedule its calendar efficiently." § 3E1.1, cmt. 6.

_____

[4] In order to qualify for the additional decrease in offense level under § 3E1.1(b)(2), the defendant must qualify for the two-level decrease under § 3E1.1(a) and his original offense level must be at least sixteen.

Here, Osorio notified the government of his intent to plead guilty on the morning trial was scheduled to begin. We have repeatedly upheld the denial of an adjustment under § 3E1.1(b)(2) when a defendant provides notice of an intent to plead guilty on either the eve or first day of trial. See United States v. Mateo-Espejo, 426 F.3d 508, 511 (1st Cir. 2005) (upholding denial of adjustment where guilty plea entered on date scheduled for jury selection); United States v. Morrillo, 8 F.3d 864, 872 (1st Cir. 1993) (same); United States v. Donovan, 996 F.2d 1343, 1345 (1st Cir. 1993) (per curiam) (upholding denial of adjustment where plea agreement was reached on the eve of the second scheduled trial date).

Arango gave the government slightly more notice, announcing his intention to plead guilty the Wednesday before his Monday trial was to begin. However, in the context of this complex case, there is little evidence that these additional days of notice saved the government significant trial preparation. The docket indicates that the government had already filed a trial brief, a proposed voir dire, a motion in limine, a list of exhibits and witnesses, and proposed jury instructions before the defendants announced their intended change of plea. At the sentencing hearing, the government reported that it already had spent significant time translating and transcribing phone conversations and preparing witnesses for the trial and that - because it

-14-

expected the matter to be contested at trial - it had already gone through a process of generating voice exemplars to authenticate Arango's voice on the audiotapes expected to be presented into evidence.

Defendants argue that the government's efforts were not wasted because many of the same steps were necessary to prepare for the evidentiary hearing on the drug quantity and amount of money involved in the charged conspiracies. However, this argument misses the point. The Guidelines are clear that a three-level reduction is warranted only where the defendants' acceptance of responsibility occurs early in the pre-trial preparation period. There is substantial evidence that the government had already invested substantial resources in preparing to try these defendants when it learned that they would plead guilty. The happenstance that some of the same evidence proved useful for sentencing purposes does not qualify these defendants for a reduction based on a timely notification of their intention to plead guilty.

## B.  Calculation of Drug Quantity and Amount of Money Laundered

Osorio contends that the district court erred in sentencing him on the basis of sixty-seven kilograms of cocaine on the drug charges and $1.8 million on the money laundering charge. He argues that the court erred in using a preponderance of the evidence standard and that, even if that standard applies, there

were insufficient facts to support the court's findings. We disagree on both counts.[5]

Osorio argues that, "where life in prison is the authorized maximum sentence, the finding of fact used to determine the sentence must be arrived at by proof beyond a reasonable doubt by a jury or a defendant's admission." The Supreme Court held in Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), and confirmed in United States v. Booker, 543 U.S. 220, 244 (2005), that any fact necessary to support a sentence exceeding the statutory maximum (other than a prior conviction) must be found by a jury beyond a reasonable doubt or admitted by the defendant. This standard does not help Osorio because he pled guilty to charges that carried a statutory maximum sentence of life in prison. See Obershaw v. Lanman, 453 F.3d 56, 60 (1st Cir. 2006).

Osorio argues – for the first time on appeal – that the higher evidentiary standard also should apply where the sentencing range includes life imprisonment because the defendant has more at risk, and his rights to due process and proof beyond a reasonable doubt thus carry more weight. Osorio cites no precedent in support of this proposition, and our case law is to the contrary. We have stated unequivocally that, under the advisory Guidelines, judicial fact-finding on drug quantity is constitutionally permissible,

_____

[5] It appears that Osorio challenges the standard of review only with respect to the drug calculation. Our discussion would, in any event, apply to both findings.

-16-

within Apprendi's limits, see, e.g., United States v. Pierre, 484 F.3d 75, 88 (1st Cir. 2007), and we have applied that principle even when defendants were subject to life imprisonment, see, e.g., United States v. González-Vélez, 466 F.3d 27, 40-41 (1st Cir. 2006). The district court's fact-finding was thus not error, plain or otherwise.

Osorio's contention that the evidence does not support the court's factual findings is also unpersuasive. His arguments mischaracterize the evidence presented at the evidentiary hearing and the court's calculations based on that evidence. In his brief, Osorio describes Cruz's testimony about the drugs transported from Queens to Massachusetts as follows:

> In her first trip, which was for [Osorio], she sold 50 kilos. In her second trip, which was for co-defendant Ar[]ango, she sold 10 kilos. Thus, according to the prosecutor's key witness, Mr. Osorio was responsible for just fifty kilos of cocaine, not sixty kilos.

However, Cruz testified that she brought cocaine from New York to Massachusetts in five separate trips, all of which were arranged at Osorio's request. Cruz also testified that Osorio told her that the first fifty kilograms she brought back from Queens was supplied by Arango. She met with the same people who had been involved in the first Queens trip on the second trip, when she transported ten additional kilograms. In two trips to the Bronx, she picked up twenty-five and fifty kilograms. She further testified that on a subsequent trip to New York, Osorio met her in Queens, transferred

-17-

fifty kilograms to her, and directed her to transport the drugs to Massachusetts. Thus, Cruz's testimony indicated Osorio's involvement in a total of 185 kilograms: the sixty kilograms picked up in Queens in two trips involving the same people; the seventy-five kilograms picked up in two trips to the Bronx; and the fifty additional kilograms that she received directly from Osorio during her third trip to Queens.[6] Thus, the evidence amply supported the court's finding that Osorio was responsible for the transport of at least sixty kilograms of cocaine from New York to Massachusetts.

Osorio also contends that neither Cruz's nor Vallejo's testimony linked him to the seven kilograms of cocaine Cruz bought from Tavarez to sell to Camilo Aguirre. Again, this contention mischaracterizes the evidence. When asked what connection the defendants had to these seven kilograms of cocaine, Vallejo responded that "they had sold it to . . . Alonso Tavarez, and then Alonso Tavarez had handed it to Liliana Cruz." Cruz also testified that the drugs she bought from Tavarez were supplied by the defendants and that, because the defendants did not want the same person to handle the money laundering and the drug sales, she and Tavarez had not mentioned the details of this particular transaction to defendants until after her arrest. Thus, the record

---

[6] Cruz's testimony suggested that Arango may not have been involved in these additional incidents, but it was clear that Osorio was involved in all five deliveries.

-18-

supports the district court's finding as to the seven kilograms of cocaine from this transaction.[7]

Osorio also challenges the court's finding regarding the amount of money involved in the money-laundering conspiracy. By his own accounting, Osorio contends that there was testimony as to only $1.35 million – consisting of $500,000 and $600,000 that Cruz transported from New York to Massachusetts at the defendants' behest, plus $250,000 related to the sale of the seven kilograms of cocaine to Camilo Aguirre - rather than the $1.8 million on which his sentence was based. This calculation misstates the evidence and the court's finding in two respects. First, money from the sale of the seven kilograms of cocaine was not, in fact, included in the money laundering total. Second, Osorio's calculation ignores Cruz's testimony that she received approximately $700,000 from Tavarez and the Cataños in the first several months of 2000, and that she distributed these funds at the defendants' direction. Correctly totaling this quantity of money yields $1.8 million.[8]

---

[7] In his pro se brief, Osorio contends that the court erred in sentencing him on the basis of drug quantities that were not a reasonably foreseeable consequence of his participation in the conspiracy. However, Cruz's testimony establishes Osorio's direct involvement in the transportation of more than sixty-seven kilograms of cocaine.

[8] As noted earlier, this figure in fact understates the testimony because it omits a second $500,000 transport of funds from New York. Osorio also argues that the court calculated the $1.8 million by multiplying the number of kilograms of cocaine by an inflated price of $29,000 per kilogram. This is yet another misstatement of the facts. The court calculated the $1.8 million

In addition to Cruz's testimony, the court also reviewed corroborating documentary evidence in the form of package receipts, wire transfer receipts, and Cruz's own accounting records. Also, the government presented transcripts of recorded telephone conversations in which Cruz and Arango went over the amounts of money she had received from the Cataños and Tavarez. In sum, overwhelming evidence supported the court's finding that $1.8 million was involved in the money-laundering conspiracy.

## C. Fine

Osorio also claims that the court erred in imposing a $2 million fine on him without first considering his ability to pay. Our review is for plain error as Osorio raises this argument for the first time on appeal.[9] We find no error. Indeed, Osorio's contention that the court must first consider the defendant's ability to pay before imposing a fine reflects a misunderstanding of the law. Section 5E1.2(a) of the Guidelines provides that "[t]he court shall impose a fine in all cases, except where the

---

separately from its drug quantity finding, as described above. Moreover, sixty-seven kilograms multiplied by a price of $29,000 per kilogram does not yield $1.8 million.

[9] Not only did Osorio fail to object at sentencing to the imposition of the fine, but he also did not object to these statements in the presentence report regarding his ability to pay: "No verifying information regarding the defendant's financial condition has been submitted to the Probation Office. Accordingly, the defendant has not demonstrated an inability to pay a fine. It should be noted that the defendant has retained counsel in this case, indicating that he does have financial resources." He did object to several other provisions in the PSR.

defendant establishes that he is unable to pay and is not likely to become able to pay any fine." We consistently have interpreted this language to place the burden on the defendant to provide evidence of inability to pay the required fine. See United States v. Uribe-Londono, 409 F.3d 1, 5 (1st Cir. 2005); United States v. Cunan, 152 F.3d 29, 37 (1st Cir. 1998); United States v. Peppe, 80 F.3d 19, 22 (1st Cir. 1996).[10]

## D. Failure to State the Reasons for Defendants' Sentences

Arango and Osorio both argue that their sentences should be vacated and their cases remanded for resentencing because the court did not state "in open court," at the time of sentencing, its reasons for the sentences imposed, as required by 18 U.S.C. § 3553(c). That provision also requires the court to explain why it imposed a sentence at a "particular point within the range" if the range exceeds twenty-four months, as it did here. See 18 U.S.C. § 3553(c)(1).

A joint sentencing hearing was conducted in January 2006, approximately eight months after the conclusion of the fourteen-day evidentiary hearing on the defendants' involvement in the charged

---

[10] Osorio also characterizes the PSR as stating that "defendant reports no assets and no prospect of any increase in assets while incarcerated," and he argues that "[n]othing in the record indicates that Mr. Osorio was not indigent." However, this misstates the PSR's contents. The PSR reports that Osorio claims no assets or income, but, as previously noted, it also indicates that Osorio has provided no information to verify his financial status and that he has retained counsel.

-21-

crimes.  To explain our conclusion that no § 3553(c) error occurred with respect to either defendant, we begin by describing the sentencing proceeding in some detail.

### 1.  The Sentencing Colloquy

Near the outset of the sentencing hearing, the district court explained that it would stay with the miscalculated $1.8 million figure for the money laundering count, see supra note 1, and it then engaged in a lengthy exchange with counsel about the defendants' request for a three-level, rather than two-level, adjustment for acceptance of responsibility.  The court considered carefully whether Osorio's Alford plea should make him ineligible for the acceptance of responsibility benefits, but it ultimately concluded that both defendants were entitled to the two-level credit.  The court next explored Osorio's criminal history, which consisted of a drunk driving incident thirteen years earlier and his failure to complete payments on the related fine, and found that Osorio properly was placed in CHC II based on that episode.

The court then proceeded to impose sentence on Arango. After confirming with both parties that it had properly calculated the Guidelines range to be 262 to 327 months, the court asked the government for its recommendation.  The government proposed a term of 262 months and a $2 million fine.  Defense counsel urged the court to accept that recommendation – the low end of the range – offering various reasons why his client should be treated

leniently.[11]   Arango also addressed the court personally, seeking to refute his leadership role in the conspiracy.[12]   The government then asked for an opportunity at some point "to just address the question of a guideline sentence versus a non-guideline sentence, the factors of 3553(a)," and the court invited the prosecutor to do so immediately.

The prosecutor spoke at length about the statutory factors, pointing out that the crime of drug trafficking is dangerous to "users, their families, and American society as a whole," and that the court had heard evidence that "Colombian drug traffickers are particularly dangerous."   He detailed the leadership role played by the defendants and the extensive nature of the conspiracies.   In examining the defendants' history and characteristics, the prosecutor acknowledged that "[e]ach has a family and friends who love them and will miss them," but urged the court to take into account the evidence that they earned substantial income from dealing drugs in the United States, returning to Colombia "to live fairly comfortably," but nonetheless

---

[11] Among other points, counsel minimized Arango's control over other participants in the conspiracy, noted that he had been kidnapped for a time in Colombia, and continued to have threats made against him.

[12] He told the court: "We never were in charge of giving any orders to this woman or to Mr. Tavarez.   The only thing that we did was earn a commission, a certain percentage.   And we're being given four points as leaders, and we never – I was never this woman's boss."

"continued to supervise and direct other people in the distribution of drugs here in the United States."

The prosecutor also emphasized the need to "send a message to other people who might think of doing the same things they are."  He continued:

> It's necessary to let people know that if they're going to stay in Colombia and direct other people in distributing cocaine or other drugs in the United States, the government's going to find them, the government's going to extradite them, the government is going to get them back here, the government is going to prove its case; and they're going to be facing very long sentences, sentencing conceivably so long that it might make somebody think twice about whether or not it's worth ruining all that money given the length of the sentences they're going to be serving.
> That's why the government feels that the conservative sentence under the guidelines at the low end is at least what's called for as to these defendants, your Honor.

Thereafter, the court, without explanation, imposed the 262-month term and a $2 million fine on Arango.

The court then addressed Osorio's circumstances, rejecting the view that CHC II overstated his criminal history and finding that his sentencing range therefore was 292 to 365 months. The government again recommended the low end of the range – 292 months.  Osorio's counsel, stating that he had intended to seek a sentence of sixteen years, ultimately asked the court to "just impose a sentence substantially less than the 292 months."  He urged the court to take into consideration the § 3553(a) factors,

noting that he had "carefully consider[ed] the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed, and why the guidelines are much more than should be imposed on this case."  He pointed to Osorio's separation from his family, including two young children, continuing threats from another member of the conspiracy, and his lack of prior criminal involvement.  Osorio also spoke at length, asking forgiveness and addressing his family circumstances, his fear of an attack on his family by Vallejo, his difficult time in jail, and his view that Cruz had not told the truth about his involvement in the conspiracy.

Osorio's counsel concluded the colloquy by asking the court to factor in his discussions with the government about Osorio's willingness to cooperate and the possibility of a so-called "safety valve" reduction,[13] for which he later was found ineligible.  The court then announced its sentencing decision:

> I am not going to impose a guideline sentence . . . . [T]he low end of the guideline sentence is 292 months, which is I guess 30 months above the sentence that I've imposed on Mr. Arango, and that 30 months is a consequence of this criminal history category two, which is the drunk driving offense. And while I don't minimize that offense, the offense involved here of these two defendants as far as I can tell are not substantially different in commission of this offense. And

---

[13] The "safety valve" provision of the Sentencing Reform Act, 18 U.S.C. § 3553(f)(1)-(5), allows courts to impose sentences below the statutory minimum in certain drug cases.

it seems to me that they should not have a different outcome on the basis of that – that drunk driving offense in Mr. Osorio's case. So I'm going to – and also because I think that the 262 months that I've imposed on Mr. Arango, and which I propose to impose on Mr. Osorio, itself is sufficient to meet the sentencing factors outlined in the statute, and for that reason I'm going to impose that sentence as the term of imprisonment on Mr. Osorio.

2.  Compliance with the Explanation Requirement

Our description of this sentencing history makes it apparent that the district court gave no contemporaneous explanation at all for Arango's sentence. For Osorio, the court explained only why it did not impose a <u>longer</u> sentence, not why it had rejected a shorter one. In most circumstances, this approach would be inadequate to satisfy the court's obligation under § 3553(c) to "state in open court the reasons for its imposition of the particular sentence." Although we do not require that the sentencing court's explanation "be precise to the point of pedantry, . . . the court ordinarily should identify the main factors on which it relies." <u>United States</u> v. <u>Turbides-Leonardo</u>, 468 F.3d 34, 40-41 (1st Cir. 2006). Here, the court's only explanation was for Osorio, and it said nothing about why such a long sentence was appropriate, other than to say it was long enough "to meet the sentencing factors outlined in the statute."

Nonetheless, we have recognized that "[e]ven silence is not necessarily fatal; 'a court's reasoning can often be inferred

-26-

by comparing what was argued by the parties or contained in the presentence report with what the judge did.'" Id. (quoting United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006)); see also García-Carrasquillo, 483 F.3d 124, 134 n.15 (1st Cir. 2007) ("[W]e reject any defense argument that we cannot uphold a reasonable sentence if the district court does not make an explicit statement of its reasons on the record. Our precedent is exceedingly clear that we can look to the record to clarify the judge's reasoning."). Multiple factors persuade us that the court's deficient explanation did not constitute error.

First, neither defendant has challenged on appeal the reasonableness of his sentence. Even with the knowledge obtained from the statement of reasons contained in their written judgments of conviction,[14] they point to no factors the court allegedly over-emphasized or neglected, and do not argue that their sentences are disproportionate to their crimes. Indeed, Arango is foreclosed from making any such claims, having asked the court to impose the very sentence that he received. Given that the explanation requirement is primarily intended to ensure meaningful appellate review of the reasonableness of a sentence, see, e.g., United

_____

[14] Because we typically view the statement of reasons as a non-public document, we do not discuss their contents here. See 1st Cir. R. 28(c) (noting that "sealed or non-public items – including a presentence investigation report or statement of reasons in a judgment of criminal conviction – . . . should be filed in a separate, sealed addendum").

States v. Manqual-Garcia, Nos. 05-2275, 05-2412, slip op. at 30 (1st Cir. Sept. 18, 2007), the need for an explicit statement is measurably reduced where – as in Arango's case – the court imposes the term the defendant has requested.  With respect to Osorio, the court similarly may have believed that defense counsel's request for a below-Guidelines sentence was satisfied by the thirty-month downward variance and, for that reason, explained only why it rejected the higher term requested by the government.  The absence of a reasonableness challenge by Osorio supports the logic of such an assumption.

However, enabling the appellate court to assess the parties' arguments about reasonableness is only one purpose of the explanation requirement.  An explanation in open court also furthers the weighty goals of transparency and credibility for the justice system.  As the Third Circuit recently commented:

> The rationale by which a district court reaches a final sentence is important.  It offers the defendant, the government, the victim, and the public a window into the decision-making process and an explanation of the purposes the sentence is intended to serve.  It promotes respect for the adjudicative process, by demonstrating the serious reflection and deliberation that underlies each criminal sentence, and allows for effective appellate oversight.

United States v. Grier, 475 F.3d 556, 572 (3d Cir. 2006) (en banc); see also United States v. Molina, 356 F.3d 269, 277 (2d Cir. 2004) (noting that purposes of § 3553(c) include "to enable the public to

learn why defendant received a particular sentence"). In every case, therefore, a purpose is served when the court publicly articulates its rationale for the sentence imposed, and our willingness to excuse summary explanations must therefore have limits. See United States v. Gilman, 478 F.3d 440, 446 (1st Cir. 2007) ("While we have on occasion gone to significant lengths in inferring the reasoning behind, and thus in affirming, some less-than-explicit explanations by district courts, there are limits.") (citations omitted); cf. Jiménez-Beltre, 440 F.3d at 521 ("[T]he district court's obligation to explain is not excused by our discretion to discern its reasoning from the record on appeal.") (Torruella, J., concurring). Such restraint is of no help to appellants, however, because we believe the court's reasoning was sufficiently transparent in the circumstances of this case that our limits were not transgressed.

As our detailed description of the hearing reveals, the district court's sentencing decisions came after considerable deliberation. Before pronouncing sentence, the court addressed at length two significant issues that were specifically contested – the propriety of a three-level adjustment for acceptance of responsibility (including whether Osorio should be given any adjustment in light of his Alford plea), and Osorio's criminal history. The court's rulings on those issues immediately followed the colloquies in which the government and defense counsel set out

their respective positions.  Although the court did not explicitly say so, it clearly was persuaded by the government's argument that the timing of the defendants' pleas foreclosed the third point for acceptance of responsibility.  The court did explain both why it granted Osorio the two point-reduction and why it refused to alter his criminal history category.[15]

In addition, the court elaborated during the hearing on its earlier decision to use the miscalculated $1.8 million as the money laundering figure and confirmed the accuracy of its Guidelines calculations with all parties.  The court heard extensive argument regarding the § 3553(a) factors from the government, and both Osorio and his attorney responded.  Importantly, the court possessed detailed knowledge of the crimes from the fourteen-day evidentiary hearing that preceded the sentencing hearing.  Indeed, the one issue personally challenged by both defendants at the sentencing hearing was their asserted

_____

[15] The court stated that, despite Osorio's <u>Alford</u> plea on the drug distribution charge (Count Three), he would grant the two-point reduction "because he entered a plea to the conspiracy count, and that count really drives the sentence."  On the criminal history, the court explained:

> Under the circumstances of this history, I cannot say that operating under and the outstanding warrant really overstate the criminal history because the conduct of this defendant includes at least two illegal entries into the United States; and, of course, there is the record that has brought him here today.  So I will not grant any departure on the ground that criminal history category two overstates the seriousness of Mr. Osorio's criminal history or the likelihood of recidivism.

leadership roles in the offense, but on that issue the court had explicitly made a finding at the end of the evidentiary hearing, ruling that "they were leaders in the activity."[16]

The full context makes it apparent that, in sentencing both defendants to the lowest term of imprisonment within the Guidelines range applicable to Arango, the court was acknowledging the defendants' arguments for leniency but rejecting their view that the § 3553(a) factors warranted a sentence outside the standard range for the crimes they committed. We previously have recognized that within-Guidelines sentences "require a lesser degree of explanation than those that fall outside the guideline sentencing range," Turbides-Leonardo, 468 F.3d at 41, and we think that observation is all the more true when the sentence is at the very bottom of the Guidelines range.[17] See United States v. Navedo-Concepción, 450 F.3d 54, 57 (1st Cir. 2006) ("The more obvious the reasons for a choice, the less that needs to be explained.").

_____

[16] The court stated:

The taped conversations make clear, and the testimony of Ms. Cruz as well, that her activities as a drug trafficker were directed by these defendants, and I find that they were leaders in the activity. Not necessarily the leader, because the evidence is that they were responsible to someone higher than they . . . .

[17] The requirement that a court explain why it chose a particular point within a Guidelines range exceeding twenty-four months, see 18 U.S.C. § 3553(c)(1), also is less pertinent in such cases.

There was, in short, no ambiguity here; the court's reasoning can be readily inferred from the record.

In sum, against the backdrop of a lengthy evidentiary hearing, acquiescence to the government's recommendation from one defendant, and a downward departure for the other defendant – and no challenge from either defendant to the reasonableness of the sentences imposed – we conclude that the district court sufficiently revealed in open court its reasons for imposing the particular sentences.[18]

**E.  Pro Se Arguments**

Finally, in a pro se brief, Osorio presents two additional arguments: that the government breached a plea agreement in which it promised him a twelve-year, seven-month sentence in exchange for pleading guilty to the drug and money laundering charges; and that it erred in sentencing him on the basis that he played a leadership role in the drug and money laundering conspiracies.  Both arguments fail under any standard of review.

---

[18] Osorio also contends that the court erred because it not only failed to explain his sentence, but also failed to even consider the factors set out in 18 U.S.C. § 3553(a).  This contention is without merit.  In imposing sentence on Osorio, the court stated that it found the 262-month sentence "sufficient to meet the sentencing factors outlined in the statute."  Even if such a comment ordinarily would not satisfy § 3553(c)'s explanation requirement, it is sufficient to show that the court did take the relevant factors into account.  This is particularly evident here given that, just prior to imposing sentence, the court heard extensive argument from the government about the § 3553(a) factors.

The evidence directly contradict's Osorio's claim that the government breached an unwritten plea agreement with him. At the sentencing hearing, Osorio answered in the negative when asked if "anyone made any promises to you . . . to get you to enter your change of plea." When the government outlined the evidence it would be presenting at the evidentiary hearing and the punishment it would seek as a consequence, Osorio made no objection indicating that such a course of action would breach a plea agreement. Osorio's PSR explicitly stated that "[t]here is no plea agreement in this case," and yet he lodged no objections to the PSR and no plea agreement was cited in objection to the government's proposed punishment at the sentencing hearing. In short, Osorio provides no documentary evidence that a plea agreement existed, and his behavior at the hearings belies the existence of such an agreement. We therefore find no error on this ground.

Osorio also renews the argument – made at the sentencing hearing – that the court erred in sentencing him on the basis of his leadership role in the conspiracies because he took orders from individuals higher in the criminal organization. Even if we credit Osorio's assertion that he took orders from others, there is ample evidence in the record that he played a leadership role in relation to individuals like Cruz, Vallejo, Tavarez and the Cataños. That he, in turn, reported to others is of no moment in determining whether he was a leader for purposes of U.S.S.G. § 3B1.1(a). See

<u>United States</u> v. <u>Casas</u>, 356 F.3d 104, 129 (1st Cir. 2004) ("The mere fact that [defendant] was subordinate to [a co-conspirator] does not establish, without more, that [defendant] was not an organizer or leader of the conspiracy.").

Accordingly, for the reasons explained above, we reject the appellants' assignments of error and <u>affirm</u> the sentences imposed by the district court.

**<u>So ordered.</u>**