# United States Court of Appeals
## For the First Circuit

No. 03-2094

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERTO FRANCISCO GARCÍA-MORALES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Torruella, Selya, and Howard, Circuit Judges.

Jorge E. Rivera-Ortíz on brief, for appellant.
    H.S. Garcia, United States Attorney, Sonia I. Torres-Pabón,
Assistant United States Attorney Chief, Criminal Division, and
Germán Rieckehoff, Assistant United States Attorney, on brief for
appellee.

August 30, 2004

**HOWARD**, **Circuit Judge**.  Roberto Francisco García-Morales appeals his conviction and sentence for conspiring to possess cocaine and heroin with the intent to distribute.  21 U.S.C. § 846. We affirm.

## I.

The events leading to García's conviction took place in October 2001.  Early in the month, the United States Customs Service, with the help of a confidential informant, infiltrated a drug smuggling enterprise, operating out of St. Maarten, headed by an individual named "Tocayo."  The confidential informant, a shipping captain, worked with Tocayo to transport a large shipment of drugs to Puerto Rico and deliver it to distributors located on the island.

Later in the month, one of Tocayo's distributors contacted the informant and arranged to meet in the food court of a shopping mall to discuss the logistics for transferring the narcotics.  Attending this meeting were García, who was introduced as "El Viejo", an individual named "Javier", the confidential informant, and an undercover Customs Service agent named Luis Carmona.  At this meeting, the informant stated that the drugs would arrive in Puerto Rico the next day.  Javier and García told Carmona and the informant that they had brought a Dodge Caravan in which they planned to deliver the drugs.  The participants agreed to effectuate the transfer at the Plaza Carolina Shopping Center in

Carolina, Puerto Rico. García turned the Caravan keys over to Carmona.

The next day Customs Service agents seized the drugs and arranged a "controlled delivery" to García. Two days later, Carmona drove the Caravan, containing a "sham" load of the seized narcotics, to the shopping center parking lot where he met García and another individual named Domingo Peña. At the mall, Carmona gave the Caravan keys to García, who passed them on to Peña to drive the Caravan. García followed closely behind in his car. A few minutes later, García stopped at a restaurant and was arrested.

## II.

García raises three main issues on appeal. First, he argues that the district court abused its discretion by permitting the government to open its case with "overview testimony" from the agent heading the investigation. Second, he claims that the district court improperly permitted this same agent to provide expert testimony on the structure and operation of a typical drug smuggling and distribution conspiracy. Finally, he contends that the district court committed clear error by applying a role-in-the-offense adjustment in calculating his sentence.

### A. Overview Testimony

The government's first witness was Special Agent Yariel Ramos, the Customs Service Agent in charge of the investigation. To open his testimony, Ramos stated the investigation's ultimate

-3-

conclusion that García was "the recipient of the narcotics, the distributor." Ramos then provided an overview of the investigation. During this overview, Ramos described several events about which he had personal knowledge. In addition, he provided a summary of a conversation, at which he was not present, between the informant and Tocayo in which the informant agreed to transport the drugs to Puerto Rico.

García contends that Ramos's overview testimony undermined the fairness of the trial because it permitted the jury to draw an inference of guilt before the jury heard from a witness with personal knowledge. We agree that the portions of Ramos's testimony which were not based on personal knowledge should have been excluded (at least at the stage of trial). But we also conclude that this error was harmless.

We recently criticized the prosecutorial practice of opening a case by calling a government agent as an "overview" witness:

> [The use of] overview testimony is inherently problematic: such testimony raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments in the overview but not in evidence. There is also the possibility that later testimony might be different than what the overview witness assumed; objections could be sustained or the witness could change his or her story. Overview testimony by government agents is especially problematic because juries may place greater weight on evidence

-4-

> perceived to have the imprimatur of the
> government.

United States v. Casas, 356 F.3d 104, 119-20 (1st Cir. 2004) (internal citations omitted); see also United States v. Mazza, 792 F.2d 1210, 1215 (1st Cir. 1986).

Portions of Ramos's testimony constitute the sort of testimony that we criticized in Casas and Mazza. Ramos was allowed to testify that García was a member of the drug conspiracy, even though the prosecution had not yet introduced evidence supporting this conclusion. See Casas, 356 F.3d at 119 (concluding that it was error to permit agent to testify that, based on the government's investigation, the defendant was a member of a drug organization before evidence to this effect had been admitted). Further, Ramos provided a summary of the informant's conversation with Tocayo, even though the informant did not testify, and Ramos was not present for this conversation. See Mazza, 792 F.2d at 1215 (concluding that it was error to allow government agent to summarize informant's conversations with defendant). Thus, the prosecution was able to use Ramos's hearsay testimony as a substitute for calling the informant. Hearsay does not become admissible merely because it is provided by a government agent in the form of an overview of the evidence. See Casas, 356 F.3d at 119.

Nevertheless, while this testimony should have been excluded, its admission was harmless in this case. In this case,

the admission of improper testimony is harmless if it is highly probable that the error did not influence the verdict.  See United States v. Piper, 298 F.3d 47, 56 (1st Cir. 2002).  The government bears the burden of establishing harmless error.  See United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997).  The harmless error inquiry is case-specific.  Among other factors, it requires consideration of the centrality of the tainted evidence, its uniqueness, its prejudicial impact, the use to which the evidence was put, and the relative strengths of the parties' cases.  See United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993).

The admissible evidence against García clearly established his participation in the charged conspiracy.  The most damning testimony came from Agent Carmona.  Carmona described, in detail, his initial meeting with García and Javier, in the shopping mall food court, where the parties planned to transfer the narcotics to García.  He testified that during this meeting Javier referred to Tocayo as the supplier of the drugs and García claimed that he was responsible for the shipment.  Carmona also testified that García provided him with the keys to the Caravan in which he was to deliver the drugs.

Carmona's testimony was corroborated by Ramos, who observed the meeting from across the food court.  Through Ramos's properly admitted testimony, the government introduced several

photographs of García meeting with the informant and Carmona.

Carmona also described García's participation in the transfer of the drugs at the Plaza Carolina Shopping Mall. During this encounter, García asked Carmona if he had spotted any police in the area and explained that they had to avoid unexpected encounters with law enforcement. After assuring García that he had not seen any police, Carmona gave García the Caravan keys and told him the location of the vehicle. García then told Carmona that, on leaving the mall, they should walk in opposite directions.

Ramos, who was part of the surveillance team following the Caravan, testified that, after leaving the mall, García gave the keys to Peña, who drove the Caravan while García followed behind in a Toyota Corolla. As further evidence of García's involvement, the government introduced his personal telephone book, seized during his arrest, which contained listings for the informant and Tocayo.

While the government's case was strong, García's defense was relatively weak, consisting entirely of cross-examination of the prosecution's witnesses to challenge their credibility. <u>See</u> <u>Sepulveda</u>, 15 F.3d at 1182 (finding error harmless where the defendant's evidence was "a drop in the proverbial bucket"). Moreover, the prejudice from Ramos's testimony was minimal. Ramos's summary of the initial conversation between the informant

and Tocayo, while providing context for the subsequent investigation, was not essential to proving García's involvement in the conspiracy. See United States v. Figueroa, 976 F.2d 1446, 1458 (1st Cir. 1992); United States v. Cintolo, 818 F.2d 980, 999 (1st Cir. 1987). Javier identified Tocayo as the supplier of the drugs, rendering Ramos's testimony cumulative. See Rose, 104 F.3d at 1414. Further, Ramos's conclusion that García was a drug distributor was later corroborated by overwhelming, uncontroverted evidence. See Casas, 356 F.3d at 121-122 (finding agent's improper overview testimony that defendant was member of drug organization harmless where that conclusion was later substantiated by strong evidence).

In light of the strength of the prosecutions's case and the limited impact of the improperly admitted testimony, we are convinced that the jurors' "'judgment was not substantially swayed by the error.'" See Mazza, 792 F.2d at 1216-17 (quoting Kotteakos v. United States, 328 U.S. 765 (1946)). Accordingly, the error is harmless.[1]

---

[1] García also argues that, on several occasions, Ramos inappropriately vouched for his own credibility and that of the informant. All of the challenged statements, except one, were made on cross-examination, after García had challenged Ramos's credibility. García cannot complain about Ramos's responses to his own cross-examination questions. See United States v. Cresta, 825 F.2d 538, 552 (1st Cir. 1987). The only other allegation of improper vouching concerns Ramos's statement, on direct examination, that the informant was a certified captain of large ships. We fail to see how this testimony constituted vouching or prejudiced García's defense.

**B. Expert Testimony**

In addition to providing an overview of the investigation, Ramos provided an explanation of the structure and operation of a typical drug distribution conspiracy. García contends that this testimony was inadmissible because it was irrelevant and Ramos was not qualified to provide it. He also argues that this testimony was unfairly prejudicial. García did not raise these arguments below so we consider them only for plain error. See United States v. Montas, 41 F.3d 777, 782-83 (1st Cir. 1994). Such an error must be clear or obvious, affect substantial rights, and seriously affect the fairness, integrity or public reputation of judicial proceedings. See United States v. Olano, 507 U.S. 725, 732 (1993).

We begin by considering the relevance of Ramos's testimony. For expert testimony to be admissible under Fed. R. Evid. 702, it must "be relevant to the task at hand" and helpful to the jury in its deliberations. United States v. Lopez-Lopez, 282 F.3d 1, 14 (1st Cir. 2002) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)). The district court maintains considerable discretion in making this determination. See United States v. Sebaggala, 256 F.3d 59, 65 (1st Cir. 2001).

"We have admitted expert testimony regarding the operation of criminal schemes and activities in a variety of

contexts, finding such testimony helpful to juries in understanding some obscure or complex aspect of the crime." Montas, 41 F.3d at 783. In particular, "expert testimony regarding the description of a typical drug network [is] relevant to provide context to the jury in evaluating the offenses charged." United States v. Clarke, 24 F.3d 257, 269 (D.C. Cir. 1994); see also United States v. Campino, 890 F.2d 588, 593 (2d Cir. 1989) ("[T]he operations of narcotics dealers are a proper subject for expert testimony under Fed. R. Evid. 702."). The district court therefore did not commit plain error by determining that Ramos's testimony about the structure and operation of a typical drug conspiracy was relevant and helpful to the jury in understanding the case.[2]

We turn next to García's contention that Ramos was not qualified to offer this testimony. Ramos served as a special agent with the United States Customs Service for three years and as a senior special agent for one year. In these capacities, Ramos's duties included investigating narcotic smuggling activities. Ramos led several of these investigations during which he oversaw the work of other agents. All told, Ramos

---

[2] García also claims that Ramos's testimony should have been excluded because it did not rest on a reliable foundation. See Daubert, 509 U.S. at 597. He has not, however, presented any developed argument on this point, and therefore we do not consider it. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

participated in between 20 to 40 narcotic investigations and 40 to 60 drug seizures. Ramos's professional background provided him with sufficient experience to explain the structure and operation of a typical drug conspiracy. See, e.g., United States v. Reynoso, 336 F.3d 46, 49 (1st Cir. 2003); United States v. Rivera-Rosario, 300 F.3d 1, 17 (1st Cir. 2002); United States v. Hoffman, 832 F.2d 1299, 1310 (1st Cir. 1987).

Finally, García claims that Ramos's testimony should have been excluded under Fed. R. Evid. 403. "Even if admissible under Rule 702, expert testimony still may be excluded under Fed. R. Evid. 403 if its probative value is substantially outweighed by the risk of unfair prejudice it creates." Lopez-Lopez, 282 F.3d at 15 (quoting Montas, 41 F.3d at 783). The jury's task was to determine whether García was a member of the charged conspiracy. Considering that most jurors are likely unfamiliar with the drug trade, Ramos's testimony provided relevant context for the subsequent evidence about García's participation. This, combined with García's failure to specify the unfair prejudice flowing from Ramos's testimony, leads us to conclude that it was not plain error for the district court to admit the testimony.

### C. Sentencing

García contends that the district court committed clear error by imposing a two-level sentencing enhancement because he

assumed a leadership role in the conspiracy.[3]  See U.S.S.G. §

3B1.1(c).  A two-level increase under § 3B1.1(c) is justified

> if the sentencing court supportably finds
> that (1) the criminal enterprise involved
> at least two complicit participants (of
> whom the defendant may be counted as
> one), and (2) the defendant, in
> committing the offense, exercised control
> over, organized, or was otherwise
> responsible for superintending the
> activities of at least one of those other
> persons.

United States v. Cruz, 120 F.3d 1, 3 (1st Cir. 1997) (en banc).

The government bears the burden of proving that the defendant

qualifies for this enhancement.  See id.  The evidence supporting

the defendant's role in the offense may be wholly circumstantial

and the government need only prove that the defendant exercised

authority or control over another participant on one occasion.  See

id. at 3-4.  We review the district court's determination for clear

error.  See United States v. Brown, 298 F.3d 120, 122 (1st Cir.

2002).

     García contends that this adjustment must be vacated

because the district court did not make specific findings

supporting its conclusion.  This argument fails because the

district court need not make specific findings when applying a

role-in-the-offense enhancement if "the record clearly reflects the

---

[3]  García has not challenged his sentence based on the Supreme
Court's recent decision in Blakely v. Washington, -- U.S. --, 124
S.Ct. 2531 (2004).

basis of the court's determination." <u>United States</u> v. <u>Marrero-Ortiz</u>, 160 F.3d 768, 779 (1st Cir. 1998).

The record before the district court amply justified its conclusion. When García met with the informant and Carmona, he was introduced as "El Viejo"; there was testimony that this is one commonly used term for the head of a drug distribution organization. <u>See</u> <u>United States</u> v. <u>Laboy</u>, 351 F.3d 578, 585 (1st Cir. 2003) (stating that use of leadership titles is relevant to a § 3B1.1(c) determination). In addition, at this meeting, García indicated that he was responsible for the drug shipment and made on the spot decisions concerning the logistics of the transfer. Finally, García assumed a leadership role during the narcotics transfer by giving the keys to Peña and instructing him to drive the Caravan. Accordingly, the district court's imposition of a role-in-the-offense enhancement was not clearly erroneous. <u>See</u> <u>Brown</u>, 298 F.3d at 122.

**III.**

For the reasons set forth above, García's conviction and sentence are **<u>affirmed</u>**.

-13-