**UNITED STATES of America,**
**Appellee,**

v.

**John PAKALA, Defendant, Appellant.**

**No. 07–2092.**

United States Court of Appeals,
First Circuit.

Heard Dec. 4, 2008.

Decided June 12, 2009.

Robert M. Greenspan, for appellant.

Sandra S. Bower, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief for appellee.

Before TORRUELLA, STAHL, Circuit Judges, and GARCÍA–GREGORY,* District Judge.

TORRUELLA, Circuit Judge.

Defendant-appellant John Pakala appeals his conviction and resulting sentence for possessing and selling stolen firearms. After careful consideration, we affirm.

## I. *Factual and Procedural Background*

At trial, Robert Boudrow, a deacon and pastoral counselor of a church in Revere, Massachusetts, testified that on June 14, 2003, he hired Pakala to help with church renovations. Boudrow, who served as one of the government's main witnesses, invited Pakala to stay at his house in Chelsea

---

* Of the District of Puerto Rico, sitting by designation.

for a few days because Pakala appeared to be living in his truck. On Wednesday, June 18, 2003, after working at the church, the two men returned to Boudrow's home where Boudrow observed that two gun cases stored in his bedroom closet, which contained five guns, appeared undisturbed. That afternoon, Boudrow left for work while Pakala remained in the Boudrow residence, but when Boudrow returned home around 9:00 p.m., Pakala and the guns were gone. Boudrow testified that in looking for Pakala, he smelled cigarette smoke near the bedroom closet that contained the gun cases. While neither Boudrow nor his wife smoked, Boudrow had observed Pakala smoke. Boudrow also noticed that keys to the gun cases, a black suitcase, and some other items were missing. Boudrow then called the police to report the stolen items. Pakala never returned to the Boudrow residence even though he left behind his truck and dog.

Pauline Hassett, a friend of Pakala's, also testified for the government, as a cooperating witness.[1] Sometime in mid-June 2003, Pakala told Hassett that he had secured a job at a church in Revere and was staying in the home of a "church guy." Pakala informed Hassett that he had seen several guns in an upstairs bedroom and planned to steal them after he was paid at the end of the week. Hassett testified that on Wednesday, June 18, Pakala told her that he had stolen the guns; she recalled the day because "it was raining and they didn't do no painting and stuff that day." Over Pakala's objection, the government introduced two weather reports that showed that it had rained on Wednesday, June 18, 2003. The weather reports were admitted into evidence as Exhibits 14 and 15 but were not published to the jury at trial.

On that day, Pakala and Hassett planned to buy drugs but got into a disagreement over who would pay and separated. Hassett alone procured drugs and returned to her apartment in Chelsea around noon. At 5:00 p.m., Pakala appeared at her apartment with a wad of cash and told her he alone had stolen and then sold five guns with a mutual friend known as "Porky." Hassett and Pakala left her apartment, bought more drugs, and stayed at a hotel for one night.

A few weeks later, after a dispute during which Pakala threw a coffee table at Hassett, hitting her on the head, Hassett contacted the police and was taken to the hospital. Once there, in addition to discussing the altercation, Hassett told the police about the stolen firearms. Officer Chris Borum confirmed at trial that Hassett told him that Pakala had bragged to her that he and another man had sold five guns. Hassett gave the police a black suitcase which Pakala had left on her back porch, an item among those taken from the Boudrow residence on June 18, 2003.

Pursuant to a grant of immunity, Angel Acevedo offered testimony that he and a group of his friends bought guns from "Porky," later identified as Angel Gonzáles, and a "tall, skinny, white man," identified by Acevedo as Pakala, on Wednesday, June 18, 2003. Police apprehended several of the five firearms. Pakala's case later was severed from Gonzáles's.

Pakala ultimately was tried on two counts—(1) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and (2) possession and sale of stolen firearms, in violation of 18 U.S.C.

---

1. On the stand, Hassett admitted to using aliases, using drugs, engaging in prostitution, and having numerous convictions. She testified that she initially met Pakala in June 2003 when she, Pakala, and a friend of Pakala's went to Dorchester to get and smoke crack cocaine.

§ 922(j). Prior to trial, on June 1, 2004, Pakala filed a motion to suppress. The motion was denied on August 1, 2005, and a trial date was set for September 26, 2005. On August 31, 2005, he requested a continuance of the trial date because of a scheduling conflict, and the district court permitted the motion by electronic endorsement. Defense counsel filed a second motion to continue on November 7, 2005, in order to seek the transcripts from Gonzáles's trial. The next day, the district court allowed the motion by electronic endorsement with the trial continued to January 20, 2006. One week before the trial date, Pakala moved to dismiss the indictment on speedy trial grounds. The district court denied the motion.

The jury convicted Pakala on both counts on February 2, 2006. Pakala's presentence report ("PSR") found that Pakala was subject to the Armed Career Criminal Act ("ACCA") based on three prior convictions for crimes of violence—an attempted burglary in Nevada and two counts of third degree burglary of an unoccupied structure in Florida under Fla. Stat. § 810.02(4)(a). Pakala's total offense level of 33, combined with a criminal history category of VI, resulted in a Guidelines Sentencing Range ("GSR") of 235 to 293 months imprisonment with Pakala subject to a statutory minimum of 180 months imprisonment.

Prior to sentencing, Pakala challenged the use of his two Florida convictions for purposes of the ACCA classification. He argued that the Florida statute was "broader" than a "generic" burglary and that the specific section of the statute to which he pled guilty did not warrant treatment as a violent felony. He also claimed that the court could not rely on complaint applications or police reports in determining whether Pakala had committed a violent felony.[2] Pakala also objected to the PSR on the grounds that he deserved a downward departure because his criminal history category overstated the seriousness of his criminal history, was the result of long-term substance abuse and a bipolar disorder, and did not show violence. He further argued that he was subjected to extreme "mental and physical distress" and that he had been denied adequate medical and psychological treatment while incarcerated. The government filed a written response which opposed Pakala's arguments[3] and urged the court to impose a 250–month sentence, about halfway between the low end and the midpoint of the applicable GSR.

At sentencing, the government stated that it had obtained the Florida information (the "Information") to which Pakala pled guilty and provided it to defense counsel. For each of the two Florida offenses, the Information specifically alleged "that the defendant did unlawfully enter or remain in a structure, to wit, a building or the curtilage thereof," and identified the specific address of the property. Defense counsel did not claim that the court had insufficient evidence to determine to which portion of the statute Pakala pleaded guilty but, rather, insisted that the crime did not constitute a violent felony because it did not involve an assault or a dangerous weapon. The district court overruled Pakala's objections, classified him as an

---

**2.** The Probation Officer who prepared the PSR responded that he looked only to the charging document and the Information to which Pakala pled guilty to determine that Pakala's guilty plea supported a conviction for a generic burglary.

**3.** The Government pointed out that Pakala's 21 criminal history points spanned more than two decades, multiple states, and included violent offenses such as burglaries, as well as convictions for forgery, theft or larceny, auto burglary, and drug offenses.

Armed Career Criminal, and sentenced him to 235 months imprisonment, the lowest sentence within the GSR. Pakala now appeals his conviction and his sentence.

## II. *Discussion*

Pakala raises four issues on appeal. We discuss each in turn.

### A. Admission of Weather Reports

■ Pakala first contends that the district erred by admitting two weather reports into evidence, Exhibits 14 and 15, which showed that it was raining on Wednesday, June 18, 2003, in Boston and the surrounding area. As Pakala adequately preserved his objection to the weather reports at trial, we review the "trial court's rulings admitting or excluding evidence only for abuse of discretion." *United States v. Gobbi,* 471 F.3d 302, 311 (1st Cir.2006).

■ Pakala first contends that the weather reports were never properly admitted, and thus it was reversible error for the prosecution to reference them in its closing arguments and to make the reports available to the jury. *See, e.g., Virgin Islands v. Joseph,* 685 F.2d 857, 863 (3d Cir.1982) (finding plain error when two incriminating documents, including a signed written confession, were inadvertently provided to the jury). However, the record demonstrates that the reports were, in fact, properly admitted. When the government offered the documents, the court, after hearing from both parties, stated:

> THE COURT: Okay. You know, sometimes you should be careful what you wish for. *I am going to let it in* and see what happens . . .
>
> [THE GOVERNMENT]: Is that for both fourteen and fifteen, your Honor?

THE COURT: Yes.

(emphasis added). In addition, Pakala argues that the district court committed error because the weather reports were never published to the jury during trial. But there was no requirement for the government to do so after they were admitted, and Pakala points to nothing to suggest otherwise.

■ Pakala also contends that the weather reports were not admissible because their probative value was substantially outweighed by their prejudicial effect on the jury. Pakala argues that because there was no evidence establishing that the work set for Pakala that day was outdoors, rather than indoors, the fact that it was raining on Wednesday, June 18, 2003, could not be used to establish that Pakala did not work that day. Thus, Pakala argues that the weather reports were irrelevant and, moreover, prejudicial, as they improperly bolstered the credibility of Hassett. Pakala contends that the government "hammer[ed] away at the evidence" and "harp[ed]" on the reports in its closing argument. We give deference to a district court's determinations regarding whether evidence is more probative than prejudicial. *See United States v. Adams,* 375 F.3d 108, 111 (1st Cir.2004). Even if the district court erred, we will not reverse if the error was harmless. *See United States v. Garcia–Morales,* 382 F.3d 12, 17 (1st Cir.2004).

■ Although the government makes a number of arguments supporting the relevancy of the weather reports, we need not address them because, as the government correctly contends, any error here was harmless. A non-constitutional evidentiary error is harmless

> if it is highly probable that the error did not influence the verdict. *See United States v. Piper,* 298 F.3d 47, 56 (1st Cir.2002). The government bears the

burden of establishing harmless error. *See United States v. Rose*, 104 F.3d 1408, 1414 (1st Cir.1997). The harmless error inquiry is case-specific. Among other factors, it requires consideration of the centrality of the tainted evidence, its uniqueness, its prejudicial impact, the use to which the evidence was put, and the relative strengths of the parties' cases. *See United States v. Sepúlveda*, 15 F.3d 1161, 1182 (1st Cir.1993).

*García–Morales*, 382 F.3d at 17 (citations in the original).

The government easily meets its burden here. To establish its case, the government not only included the testimony of Hassett, but also the testimony of Boudrow, who testified at length concerning the day both the guns and Pakala went missing. Although Hassett's and Boudrow's testimony concerning the timing of the events on the date of the theft—Wednesday, June 18, 2003—were not entirely consistent, their testimony coincided substantially, such that the jury was free to credit the salient portions of their testimony and conclude that Pakala took the guns and sold them. *See United States v. Lara*, 181 F.3d 183, 204 (1st Cir.1999) ("[J]urors are not required to discard testimony that appears to contain internal inconsistencies, but may credit parts of a witness's testimony and disregard other potentially contradictory portions."). The jury also heard from Acevedo, who purchased the guns and whose testimony was corroborated by the stolen guns later recovered. More importantly, like Boudrow and Hassett, Acevedo essentially provided the same account of the events of Wednesday, June 18, 2003—that Pakala stole firearms and later sold them. Thus, the "relative strength" of the government's case was overwhelming.

In addition, the weather reports were not sufficiently prejudicial to merit reversal. *See García–Morales*, 382 F.3d at 17 (noting factors to consider as including the evidence's "prejudicial impact"). As Pakala admits, the weather reports were never published to the jury at trial, limiting any impact they may have had. Moreover, despite Pakala's claim that the government "hammer[ed] away at the evidence" and "harp[ed]" on the reports in its closing argument, the government only referred to the reports in a smattering of places. Finally, the reports only corroborate a small part of Hassett's testimony, her mention of the fact that it was raining the day Pakala came to her with the stolen guns.[4] At best, the impact of the weather reports was minimal.

The strength of the government's case and the miniscule impact of the weather reports, taken together, make it "highly probable that the [assumed] error did not influence the verdict." *Id.* Since we find that any possible error here was harmless, we hold that the district court did not err in admitting the weather reports.

**B. Whether Prior Burglaries Are Crimes of Violence Under the ACCA**

Pakala next contends that the district court erred when it considered his two prior convictions under Florida state law as "violent felon[ies]" for purposes of clas-

---

4. For example, the government stated:

Now, I just said that [Hassett] told you it was raining that day and that's why they weren't working on the parsonage. And when you go back to the jury room, take a look at Exhibits 14 and 15. You didn't hear testimony about these documents, but they're admitted and I will tell you what they are and how you should review them.
. . .
And what do these exhibits tell you? That it was indeed raining on that date.

sifying him as an armed career criminal under the ACCA.

■ Under the ACCA, an individual convicted of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1), as Pakala was here, is subject to a sentencing enhancement as an armed career criminal if he "has three previous convictions by any court ... for a *violent felony* or a serious drug offense, or both." *See* 18 U.S.C. § 924(e)(1) (emphasis added). The ACCA defines a "violent felony" as a crime that "is *burglary,* arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." *Id.* § 924(e)(2)(B)(ii) (emphasis added). The determination of whether a prior conviction qualifies as a predicate offense for purposes of the ACCA is a legal question subject to *de novo* review. *United States v. Richards,* 456 F.3d 260, 262 (1st Cir. 2006), *cert. denied,* 550 U.S. 905, 127 S.Ct. 2097, 167 L.Ed.2d 816 (2007).

Pakala argues that the district court erred in considering his two convictions under Fla. Stat. § 810.02(4)(a) violent felonies for purposes of the ACCA. Section 810.02(4) provides:

> Burglary is a felony of the third degree, ... if, in the course of committing the offense, the offender does not make an assault or battery and is not and does not become armed with a dangerous weapon or explosive, and the offender enters or remains in a:
>
> (a) Structure, and there is not another person in the structure at the time the offender enters or remains; or
>
> (b) Conveyance, and there is not another person in the conveyance at the time the offender enters or remains.

In *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), the Supreme Court addressed what "burglar[ies]" constitute "violent felon[ies]" under § 924(e)(2)(B)(ii) of the ACCA. *See id.* at 577, 110 S.Ct. 2143. Noting that the statute takes a "categorical approach," *id.* at 588–89, 110 S.Ct. 2143, the Court held that a "generic burglary" constitutes a "violent felony" for purposes of the ACCA, and defined a "generic burglary" as "any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime," *id.* at 599, 110 S.Ct. 2143.

Pakala argues that the statute under which he was convicted covers more than a "generic burglary" because "Structure" as defined by Fla. Stat. § 810.011 includes "curtilage." Specifically, the statute provides that " 'Structure' means a building of any kind, either temporary or permanent, which has a roof over it, *together with the curtilage thereof.*" Fla. Stat. § 810.011(1) (emphasis added). For that reason, Pakala claims that the convictions do not constitute violent felonies under the ACCA because it covers "places ... other than buildings." *See Taylor,* 495 U.S. at 599–600, 110 S.Ct. 2143 (addressing the separate issue of statutes that "define burglary more broadly, *e.g.,* ... by including places ... other than buildings."). We agree.

■ Pakala is correct that the Florida statute under which he was convicted includes "curtilage" as part of the definition of "structure." Moreover, nothing on the face of the Information *excludes* the curtilage. In fact, the Information states that Pakala "did unlawfully enter or remain in a structure, to wit, a building *or the curtilage thereof.*" (emphasis added). Because, on this record, his convictions may involve the curtilage of a structure, they cannot constitute "generic burglaries" for pur-

poses of the ACCA. *See United States v. Matthews,* 466 F.3d 1271, 1274 (11th Cir. 2006) (holding that two third degree burglary convictions under Fla. Stat. § 810.02 were not "generic burglaries" under the ACCA because "on this record, one cannot determine whether either of his two third-degree burglary convictions was for burglary of the roofed portion of a structure," rather than the curtilage).

■ Pakala is not out of the woods just yet. The ACCA contains an "otherwise" clause, which defines a "violent felony" as a crime that, along with "burglary," "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). We continue to apply a categorical approach to the "otherwise" clause of the ACCA. *See United States v. Giggey,* 551 F.3d 27, 38–39 (1st Cir.2008) (en banc).

In *Matthews,* the Eleventh Circuit addressed whether convictions for third degree burglary under Fla. Stat. § 810.02(a) are "violent felon[ies]" under this "otherwise" clause. 466 F.3d at 1274. It held that since Florida case law "narrowly defines the curtilage of a structure to include only an enclosed area surrounding a structure," a burglary of a structure's curtilage is "a crime that 'presents a serious potential risk of physical injury to another.'" *See id.* at 1275. Accordingly, it held in that case that "even if Matthews's third-degree burglary convictions are not convictions for 'generic burglary,' they are convictions for violent crimes under the

ACCA because they satisfy this alternative definition." *Id.*

Similarly, in *James v. United States,* 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007), the Court addressed a conviction under Florida's attempted burglary law, which defined "[d]welling" to include both the "structure" and the "curtilage thereof." *See id.* at 213, 127 S.Ct. 1586 (discussing Fla. Stat. § 810.011(2) (1993)). There, the Supreme Court concluded that "a burglar who illegally attempts to enter the enclosed area surrounding a dwelling creates much the same risk of physical confrontation with a property owner, law enforcement official, or other third party as does one who attempts to enter the structure itself." *Id.* Accordingly, the Supreme Court held, following *Matthews,* that "[s]uch an attempt 'presents a serious potential risk that violence will ensue and someone will be injured'" for purposes of the "otherwise" clause. *Id.* (citing *Matthews,* 466 F.3d at 1275).

Both *Matthews* and *James* answer in the affirmative that a burglary of the "curtilage" of a structure under Florida law presents a serious potential risk of physical injury to another for purposes of the "otherwise" clause of the ACCA. It follows that Pakala's two convictions for third degree burglary under Fla. Stat. § 810.02(a), which also involve, according to the Information, "a building or the curtilage thereof," constitute "violent felon[ies]" under the "otherwise" clause of the ACCA. Thus, no error occurred.[5]

**5.** Because we hold that Pakala's convictions constitute "violent felon[ies]" under the "otherwise" clause of the ACCA, we do not need to address Pakala's claim that the district court impermissibly looked at the affidavit in support of the Information. Of course, a district court is limited in what it can review to determine whether a conviction is a violent felony under the ACCA. *See Shepard v. United States,* 544 U.S. 13, 26, 125 S.Ct. 1254, 161

L.Ed.2d 205 (2006) (noting that, for purposes of determining whether a guilty plea to a nongeneric burglary statute constitutes a generic burglary, a district court "is limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information.").

## C. Sentencing

■ Pakala also challenges his sentence. He first claims that the district court failed to make findings to support the sentence imposed in violation of 18 U.S.C. § 3553(c), which requires a court to "state in open court the reasons for its imposition of the particular sentence." He argues, in particular, that (1) the district court failed to discount his long criminal history, since it was "devoid of violent crime," and (2) failed to take into account his long history of substance abuse. As Pakala failed to challenge the adequacy of the district court's explanation at sentencing, plain error review applies. *See United States v. Mangual–García*, 505 F.3d 1, 14–15 (1st Cir.2007); *but see United States v. Cirilo–Muñoz*, 504 F.3d 106, 132 n. 91 (1st Cir.2007) (Lipez, J., concurring) (questioning use of plain error review in challenge under Section 3553(c)).

We find no error, plain or otherwise. "We previously have recognized that within-Guidelines sentences 'require a lesser degree of explanation than those that fall outside the guideline sentencing range,' ... and we think that observation is all the more true when the sentence is at the very bottom of the Guidelines range." *See United States v. Arango*, 508 F.3d 34, 48 (1st Cir.2007) (quoting *United States v. Turbides–Leonardo*, 468 F.3d 34, 40–41 (1st Cir.2006)). Although the district court did not explicitly address Pakala's grounds above, it heard Pakala's arguments, as well as the government's recounting of Pakala's lengthy criminal history and the fact that he committed serious offenses in different states. Thus, one can infer that, in imposing the sentence, the district court was not swayed by Pakala's mitigation evidence and found more compelling the government's arguments in favor of a Guidelines sentence for Pakala. *See United States v. Vázquez–Rivera*, 470 F.3d 443, 448 (1st Cir.2006) ("[W]e find it easy to infer that the sentencing court did not find Vázquez's arguments ... persuasive and that it thought that a sentence based on the Guidelines recommendation was warranted.").

Pakala finally contends that his sentence was otherwise unreasonable because the district court failed to grant a downward departure for his sentence.[6] We have held that review of a denial of a downward departure is unavailable, as the decision is discretionary. *United States v. Meléndez–Torres*, 420 F.3d 45, 50 (1st Cir.2005); *see also United States v. Kornegay*, 410 F.3d 89, 98 (1st Cir.2005) (holding that if "the defendant's claim is only that the district court unreasonably declined to exercise its discretion to grant a departure, we may not review it").

In any event, to the extent that Pakala challenges the substantive reasonableness of his within-guidelines sentence, the sentence here was amply supported by the record, and the sentence imposed was the lowest within the GSR. As Pakala does not present any "fairly powerful mitigating reasons" that suggest that the district court "was unreasonable in balancing pros and cons," we see no basis for disturbing his sentence. *See United States v. Beatty*, 538 F.3d 8, 17 (1st Cir.2008) (requiring such "powerful mitigating reasons" for any "defendant who wishes to attack an in-guideline-range sentence as excessive.") (quotation marks omitted).

However, in this case, to the extent any such error occurred, it was harmless.

**6.** Pakala also argues that the district court "may" have misunderstood that it had the authority to impose a downward departure. However, Pakala does not, and cannot, point to anything in the record to support that claim.

## D. Speedy Trial Act

After briefing, but prior to oral argument, Pakala raised a new argument that the district court erred in failing to articulate its reasons for granting two "ends of justice" continuances sought by Pakala prior to denying his motion to dismiss under the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (the "Speedy Trial Act" or the "Act"). Pakala points to *Zedner v. United States*, 547 U.S. 489, 126 S.Ct. 1976, 164 L.Ed.2d 749 (2006), where the Supreme Court, interpreting the Act, required district courts to " 'se[t] forth, in the record in the case, either orally or in writing, its reasons' for finding that the ends of justice are served and they outweigh other interests" in deciding a motion for an "ends of justice" continuance. *Id.* at 506, 126 S.Ct. 1976 (quoting 18 U.S.C. § 3161(h)(8)(A) (2006)).[7]

Pakala argues that the district court failed to follow *Zedner*, and, accordingly, that his conviction should be dismissed under the Act. *See* 18 U.S.C. § 3162(a)(2) ("If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment *shall be dismissed* on motion of the defendant") (emphasis added); *see also Zedner*, 547 U.S. at 509, 126 S.Ct. 1976 (noting that "[t]he sanction for a violation of the Act is dismissal. . . .").

As an initial matter, the government contends that Pakala waived the issue because he failed to raise it in his initial brief. "We have consistently held that arguments not raised in the initial appellate legal brief are considered waived." *See United States v. Capozzi*, 486 F.3d 711, 719 n. 2 (1st Cir.2007). However, the rec-

ord is fully developed with respect to Pakala's claim, such that no additional fact-finding is necessary, and thus no "special prejudice" to the government would result in addressing the claim. *See Nat'l Ass'n of Social Workers v. Harwood*, 69 F.3d 622, 627–28 (1st Cir.1995) (noting that a failure to raise an issue to the district court can be excused where, among other things, the appellant did not "deprive[ ] the court of appeals of useful factfinding" and the claim "is law-based, not fact-based," such that there is "no special prejudice or inequity to the" other side); *see also United States v. LaGuardia*, 902 F.2d 1010, 1013 (1st Cir.1990) (permitting review of an issue raised for the first time on appeal where, among other things, "the point can be resolved with certitude on the existing record, a factor that often inclines a court to entertain a pivotal argument for the first time on appeal").

■■■■ "We review the district court's denial of a motion to dismiss based upon the Speedy Trial Act *de novo* as to legal rulings and for clear error as to factual findings." *United States v. Maxwell*, 351 F.3d 35, 37 (1st Cir.2003) (citation omitted). We also review *de novo* the calculation of days included and excluded for purposes of the Speedy Trial Act. *See United States v. Barnes*, 159 F.3d 4, 10 (1st Cir.1998).

We begin with the basics. The Speedy Trial Act requires a district court to try a defendant "within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1) (2006). The Act man-

---

7. We note that the Speedy Trial Act was subsequently amended after *Zedner*. Thus, we refer to the 2006 version of the Act in deciding this issue. The requirement at issue in *Zedner*, that a district court "set[ ] forth, in the record of the case, either orally or in writing, its reasons for finding" an ends of justice continuance, now appears at § 3161(h)(7)(A) of the Act.

dates the exclusion of certain dates, such as "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." *See, e.g., id.* § 3161(h)(1)(J). The Act also permits the exclusion of days resulting from the granting of a motion to continue, "if the judge granted such continuance on the basis of his findings that the *ends of justice* served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(8)(A) (emphasis added). The Act provides a number of factors a court "shall consider" in considering an "ends of justice" continuance, such as whether a failure to grant the continuance "would unreasonably deny the defendant ... continuity of counsel" or "would deny counsel for the defendant ... the reasonable time necessary for effective preparation." *See id.* § 3161(h)(8)(B)(iv).

Because Pakala does not challenge the exclusion of any delay up to the August 1, 2005 denial of his motion to suppress, we start the clock there. From that date until the filing of Pakala's motion to dismiss on Speedy Trial Act grounds on January 13, 2006, 165 days had passed. *See United States v. Connor,* 926 F.2d 81, 84 (1st Cir.1991) ("[A] motion for dismissal [under the Speedy Trial Act] is effective only for periods of time which antedate the filing of the motion. Subsequent periods of delay, whether includable or excludable, are inconsequential.").

In the interim, Pakala's counsel filed two motions for a continuance that resulted in "ends of justice" exclusions. The first motion, filed on August 31, 2005, sought to exclude August 1, 2005, through November 14, 2005, due to a scheduling conflict for defense counsel and because Pakala sought the transcripts from the trial of the severed co-defendant. The second motion,

filed on November 7, 2005, sought to exclude November 7, 2005, through January 20, 2006, as defense still awaited transcripts and "the transcripts [were] necessary for [Pakala] to adequately prepare, with his counsel for trial." The district court allowed both motions by electronic endorsement. The allowance of these motions excluded *all* of the days between the start date for Speedy Trial Act purposes (August 1, 2005) and the end date (January 13, 2006).

Pakala does not challenge the allowance of these motions. Rather, Pakala contends that the district court erred because, up to and including the denial of Pakala's motion to dismiss, the court never articulated its reasons for allowing these two motions for "ends of justice" continuances and, moreover, failed to calculate and articulate the days excluded. Instead, in allowing the two motions for "ends of justice" continuances and in denying Pakala's motion to dismiss, the district court only entered electronic endorsements that did not even hint at the days excluded or the reasons why.

For support, Pakala relies on *Zedner,* where the Supreme Court similarly reversed the denial of a motion to dismiss on Speedy Trial Act grounds where the district court failed to articulate the reasons for exclusion and the days excluded. But the facts there were extreme. There, the defendant, at the time seeking a third continuance, entered into a "waiver for all time" that prospectively waived his Speedy Trial rights. *See Zedner,* 547 U.S. at 493–94, 126 S.Ct. 1976. In addition, the defendant was borderline incompetent to stand trial. *Id.* at 495–96, 126 S.Ct. 1976. Four years after being indicted, the district court denied the defendant's motion to dismiss on Speedy Trial Act grounds based on the defendant's prospective waiver. *Id.*

at 496, 126 S.Ct. 1976. The Court of Appeals affirmed. *Id.*

In reversing the denial of the defendant's motion to dismiss, the Supreme Court held, among other things, that the prospective waiver signed by the defendant was unenforceable, *see id.* at 502, 126 S.Ct. 1976, and that judicial estoppel did not bar the defendant's Speedy Trial Act claims. *See id.* at 504–06, 126 S.Ct. 1976. More importantly, the Court concluded that the Speedy Trial Act required the district court to " 'se[t] forth, in the record of the case, either orally or in writing, its reasons' for finding that the ends of justice are served and they outweigh other interests." *Id.* at 506, 126 S.Ct. 1976 (quoting 18 U.S.C. § 3161(h)(8)(A) (2006)). The Supreme Court further held that "at the very least the Act implies that those findings must be put on the record by the time the district court rules on a defendant's motion to dismiss under § 3162(a)(2)," and that "[t]he best practice ... is for a district court to put its findings on the record at or near the time when it grants the continuance." *Id.* at 507 & n. 7, 126 S.Ct. 1976. As the district court in that case failed to do so, the Supreme Court reversed, finding such an error not harmless because "the harmless-error rule would also tend to undermine the detailed requirements of the provisions regulating ends-of-justice continuances." *Id.* at 508, 126 S.Ct. 1976.

Although no prospective waiver is at issue in this case, Pakala argues that the result in *Zedner* equally applies here, since the district court similarly failed to articulate the basis for allowing the "ends of justice" continuances.

But a closer reading of *Zedner* reveals otherwise. In *Zedner* the Supreme Court declined to apply judicial estoppel to preclude the defendant from both enjoying the benefit of a continuance and then challenging such a continuance on the ground that it was not supported by an "on the record" finding as required under 18 U.S.C. § 3161(h)(8)(A). Although noting that "this estoppel doctrine is equitable and thus cannot be reduced to a precise formula or test," the Court articulated several factors to consider in applying judicial estoppel:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position.... A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Zedner*, 547 U.S. at 504, 126 S.Ct. 1976 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)). Thus, the Court declined to apply judicial estoppel since, among other things, the defendant's position in support of the continuances "was not 'clearly inconsistent' with the position that he now takes in seeking dismissal of the indictment." *Id.* at 505, 126 S.Ct. 1976.

However, the Supreme Court noted that "[t]his would be a different case if petitioner had succeeded in persuading the District Court ... that the factual predicate for a statutorily authorized exclusion of delay could be established." *Id.* In particular, the Court noted, with respect to a crucial January 31 status conference, that

> [i]n fact, however, the discussion at the January 31 status conference did not focus on the requirements of the Act. Rather, the court and the parties proceeded on the assumption that the court's waiver form *was*

*valid and that the Act could simply be disregarded.* Nothing in the discussion at the conference suggests that the question presented by the defense continuance request *was viewed as anything other than a case-management question that lay entirely within the scope of the District Court's discretion.* Under these circumstances, the best understanding of the position taken by petitioner's attorney at the January 31 status conference is that granting the requested continuance would represent a sound exercise of the trial judge's discretion in managing its calendar. This position was not "clearly inconsistent" with petitioner's later position that the continuance was not permissible under the terms of the Act. Accordingly, we hold that petitioner is not estopped from challenging the excludability under the Act of the 1997 continuance.

*Id.* at 505–06, 126 S.Ct. 1976 (emphasis added).

 In contrast, this case supports a finding of judicial estoppel. In his two motions for "ends of justice" continuances, Pakala each time asserted statutorily authorized exclusions of delay. The first was for "continuity of counsel" given a scheduling conflict, and the second was for "reasonable time necessary for effective preparation" to allow Pakala's defense counsel the opportunity to obtain the transcripts from Angel Gonzáles's trial, and thus provide Pakala's defense counsel with adequate time to prepare for trial. *See* 18 U.S.C. § 3161(h)(8)(B)(iv) (2006) (noting both grounds for allowing an "ends of justice" continuance).

Moreover, it was "clearly obvious" that the district court, in granting the motions, necessarily adopted both grounds. *See*

*United States v. Bruckman,* 874 F.2d 57, 62 (1st Cir.1989) (holding that "the basic facts and justifying grounds for the requested continuance and excludable time under the Speedy Trial Act are clearly obvious as explained in the government's motion and memorandum, which was 'allowed' by the trial court."). We have held that "it is not necessary for the court to articulate the basic facts when they are obvious and set forth in a motion for a continuance." *United States v. Rush,* 738 F.2d 497, 507 (1st Cir.1984). Thus, the district court's actions support a finding that the district court was "persuad[ed] . . . that the factual predicate for a statutorily authorized exclusion of delay could be established." *Zedner,* 547 U.S. at 505, 126 S.Ct. 1976.

Accordingly, we conclude that Pakala's position in his motion to dismiss—that the district court failed to credit its grounds for granting Pakala's "ends of justice" continuances—is "clearly inconsistent" with its prior position concerning the district court's granting of its two motions for "ends of justice" continuances for the reasons stated within those motions. Moreover, Pakala would obtain an "unfair advantage" by benefitting from his continuances and then later claiming that he was somehow prejudiced by the district court's actions. *See id.* at 504, 126 S.Ct. 1976. Thus, judicial estoppel applies to Pakala's claims.

In so holding, we stress that the far better course for the district court would have been to articulate its reasons for granting the "ends of justice" continuances. Whatever administrative ease is obtained in simply allowing motions for "ends· of justice" continuances by stock electronic order, it is at odds with *Zedner's* clear holding that a district court must make on the record findings justifying the grant of any "ends of justice" continuance.

### III. *Conclusion*

For the foregoing reasons, we affirm the district court in all respects.

*Affirmed.*